CITY OF STOUGHTON,
WISCONSIN, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

INTEL CORPORATION, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

CITY OF ELYRIA, OHIO, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Nos. 86–1492, 86–1499 and 86–1502.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 27, 1988.

Decided Sept. 27, 1988.

J. Michael Skibinski, Stoughton, Wis., for petitioner, City of Stoughton, Wisconsin.

Edward L. Strohbehn, Jr., Washington, D.C., for petitioner, Intel Corp.

Paul E. Gutermann, Washington, D.C., for petitioner, City of Elyria. Jeffrey O. Cerar, Washington, D.C., also entered an appearance, for petitioner, City of Elyria.

Lawrence E. Blatnik, Atty., Dept. of Justice and Lawrence E. Starfield, Atty., E.P.A., with whom Roger J. Marzulla, Asst. Atty. Gen., Lawrence J. Jensen, Gen. Counsel, and Earl Salo, Asst. Gen. Counsel, E.P.A., Washington, D.C., were on the brief, for respondent.

Before ROBINSON, RUTH BADER GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Each petitioner owns one or more landfill sites included by the Environmental Protection Agency ("EPA" or "the Agency") on the second update of the National Priorities List ("NPL"). Each alleges that EPA's decision to include its site or sites was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. After reviewing each case, we find that EPA followed proper procedures in each instance, and did not act arbitrarily or capriciously. We therefore deny all three petitions.

I. BACKGROUND

Congress in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96–510, 94 Stat. 2767 (codified in pertinent part at 42 U.S.C. § 9601 et seq. (1982 & Supp. IV 1986)), *amended by* Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613, authorized EPA[1] to respond to actual and

---

1. CERCLA confers this authority on the President who in turn has delegated most of the authority to the Administrator of the EPA. *See* Exec.Order No. 12,316, 46 Fed.Reg. 42,237 (Au-

threatened releases of hazardous substances, pollutants, and contaminants. Under CERCLA, EPA is engaged in a continuing effort to address the growing problem of inactive hazardous waste sites throughout the country. *See Eagle–Picher Indus. v. EPA,* 759 F.2d 922, 925 (D.C.Cir.1985) (*Eagle–Picher II*). In order to enable and ensure EPA's response to those sites most urgently in need of cleanup, CERCLA requires the Agency to compile a National Priorities List of releases or "threatened releases" of hazardous substances across the country, 42 U.S.C. § 9605(8)(B); *Eagle–Picher II,* 759 F.2d at 926, and creates the Hazardous Substance Response Trust Fund ("Superfund"), 42 U.S.C. § 9631; *Eagle–Picher II,* 759 F.2d at 926 n. 1. In compiling the NPL, EPA utilizes a scientific model called the "Hazardous Ranking System" ("HRS") which is applied to data from observed or potential releases of hazardous waste to derive a "score" for the purpose of determining the relative risk from various sites. *Eagle–Picher Indus. v. EPA,* 759 F.2d 905, 910 (D.C.Cir.1985) (*Eagle–Picher I*). At present, EPA includes any site yielding a score of 28.5 or greater on the NPL. *Id.* at n. 17 (citing 48 Fed.Reg. 40,658, 40,660 (1983)).

Once a site is included on the NPL, it becomes eligible for remedial action financed by the Superfund. *See* 40 C.F.R. § 300.68(a) (1987). Site owners (as well as generators and transporters of hazardous substances) are ultimately liable for response actions, and EPA has the option of requiring the injuring party to perform response actions in the first instance, or reimburse the fund after response action has been taken. 42 U.S.C. § 9606–07(a).

After initial publication of the NPL on September 8, 1983, 48 Fed.Reg. 40,658–73 (1983), EPA, pursuant to congressional mandate, 42 U.S.C. § 9605(8)(B), updates the list at least once annually. On October 15, 1984, the Agency published as a proposed rule the second update to the NPL which included among sites proposed for inclusion the four sites at issue in these petitions: a site in Stoughton, Wisconsin,

owned by the city of Stoughton ("Stoughton Landfill"); two sites in Santa Clara, California, operated by Intel Corporation ("Intel Santa Clara III" and "Intel Magnetics"); and a site in Elyria, Ohio, owned by the city of Elyria ("Republic Steel Quarry"). 49 Fed.Reg. 40,320 at 40,333, 40,335. After a public comment period during which each of the interested parties commented on the proposed sites, EPA published a final rule on June 10, 1986, adding 170 new sites to the NPL including the four listed above. 51 Fed.Reg. 21,054–98 (1986). Each of the relevant site-owners petitioned us for review.

## II. Review of the Sites

Since this Court has already approved EPA's use of the HRS as a means of selecting sites for inclusion on the NPL, *Eagle–Picher I, supra,* 759 F.2d at 919–22, our review is a site-specific one; it is to determine if EPA's inclusion of each of the four listed landfills is consistent with "the Act and the regulations promulgated thereunder, and is not arbitrary." *Eagle–Picher Indus. v. EPA,* 822 F.2d 132, 137 (D.C.Cir. 1987) (citations omitted) (*Eagle–Picher III*). We will discuss each in turn.

### A. *The Stoughton Landfill*

■ Petitioner city of Stoughton operated its five acre landfill from the mid–1950's until 1978. The record evidence indicates that from 1953 to 1963 the site accepted hazardous waste, including several million gallons of solvents and other liquid organic compounds, from a tire manufacturer. The soils in the area of the site are moderately to highly permeable. The landfill did not have a liner to prevent leaching of contaminants from the landfill to the environment, or a system to collect accumulated leachate. After the closing of the site in 1978, six monitoring wells were placed in and around the landfill. In 1983, sampling of the monitoring wells by the state of Wisconsin detected elevated levels of volatile organic compounds in three of the six wells.

gust 20, 1981); Exec.Order No. 12,580, 52 Fed.    Reg. 2,923 (Jan. 29, 1987).

In scoring sites for possible inclusion on the NPL, EPA "[e]valuate[s] several of the most hazardous substances at the facility independently and enter[s] only the highest score in the [toxicity/persistence] matrix." 40 C.F.R. pt. 300, app. A § 3.4 (1987). In the original scoring of the Stoughton site, EPA used vinyl chloride as the basis for scoring toxicity/persistence.

After the publication of the proposed rule, the city of Stoughton filed comments including the results of its own sampling at the site. Based on tests conducted on these samples by laboratories of its own choosing, the city challenged the presence of vinyl chloride, though conceding that observed release of some contaminants to groundwater had occurred. EPA re-evaluated all available data in response to the comments and removed vinyl chloride from the scoring package. Support Document for the Revised National Priorities List (EPA's Response to Public Comments (Sept. 5, 1986), NPL–U2–10–56, *reprinted in* Joint Appendix ("J.A.") 193, 207–10. However, based on Attachment B–2 of the city's comments (a portion of the lab reports) EPA found chloroform to be present at the site and substituted that chemical for vinyl chloride in the toxicity/persistence matrix. This substitution resulted in a score higher than that originally presented by EPA and continued inclusion of the site on the NPL. None of the other chemicals present would have resulted in inclusion.[2]

City of Stoughton attacks EPA's decision on the theory that the data showing chloroform to be present is invalid, and that the use of invalid data as a basis for administrative action is arbitrary and capricious. The city argues that the use of invalid data is, in itself, an arbitrary and capricious action. Further, it argues that EPA has arbitrarily and capriciously failed to follow its own regulations in that EPA relies only on *valid* data concerning observed releases. *Cf.* 49 Fed.Reg. 37070, 37078 (1984).

City correctly states the law. The Agency does not contend that it is entitled to rely on invalid data, nor that it may ignore its own regulations. The problem with petitioner's argument is that it is entirely conclusory. The city argues that EPA has acted arbitrarily and capriciously by relying on invalid data. Without the conclusion that the data is invalid, the city has no argument. The record does not demonstrate that the data is invalid. The data showing the presence of chloroform was in fact submitted to EPA by the city. A split of the same sample tested by another lab, using a different methodology, did not reveal chloroform. But this does not establish that the positive result is the invalid one. Of course, it may be invalid. The city's problem is that it may not. EPA's determination to accept the positive result rather than the negative was in fact consistent with its own regulations. The HRS Manual provides that

[i]f a contaminant is measured (*regardless of frequency*) in groundwater or in a well in the vicinity of the facility at a significantly (in terms of demonstrating that a release has occurred, not in terms of potential effects) higher level than the background level, then quantitative evidence exists, and a release has been observed.

40 C.F.R. pt. 300, app. A § 3.1 (1987) (emphasis added). Multiple detections are not required.

Furthermore, in the present case it is at least as likely that the positive results were the correct data as it is that the negative results were. In fact, on the record before us, the positive results may be the more dependable, since that lab used detection methods for concentrations of 1 ug/1 or greater, while the lab not finding chloroform to be present used detection methods revealing only concentrations of 5 ug/1 or greater. City of Stoughton Landfill Analyses of Volatile Organic Compounds in Groundwater Monitoring Wells at 1–4 (Dec. 8, 1984), NPL–U2–3–500, *reprinted in* J.A. 178–82. Thus, chloroform at levels be-

**2.** The score with chloroform included is 35.79. The HRS score of the site without chloroform included as an observed release is 24.49. As noted, EPA uses 28.5 as a minimum score for potential NPL sites.

tween 1 and 5 ug/1 would not have been detected by the laboratory submitting negative results.

Finally, Stoughton argues that it should have been given a further opportunity to comment on the adjusted scoring of the site. There is no merit to this claim. We have previously held that an agency may make changes in its proposed rule on the basis of comments without triggering a new round of comments, at least where the changes are a "logical outgrowth" of the proposal and previous comments. *See NRDC v. Thomas*, 838 F.2d 1224, 1242 (D.C.Cir.1988); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C.Cir.1983), and cases cited therein.[3]

Certainly, EPA could have permitted further comment or conducted further testing. Either course would have consumed further assets of the Agency and would have delayed a determination of the risk priority associated with the site. Yet as we have recognized elsewhere, "the NPL is simply a rough list of priorities, assembled quickly and inexpensively to comply with Congress' mandate for the Agency to take action straightaway." *Eagle–Picher II*, 759 F.2d at 932. Once again, we determine that "EPA's decision to reconcile the need for certainty before action with the need for inexpensive, expeditious procedures to identify potentially hazardous sites ... is reasonable and fully in accord with congressional intent." *Eagle–Picher I*, 759 F.2d at 921.

In sum, we conclude that petitioner has not demonstrated that EPA acted arbitrarily, capriciously, or in violation of law in placing the Stoughton Landfill on the NPL.

## B. *The Intel Sites*

Petitioner Intel Corporation attacks the inclusion of two of its landfill sites on the NPL update.[4] Intel Santa Clara III is a four acre facility used by Intel Corporation to test micro processors. Intel Magnetics is approximately one acre used by Intel to produce and test magnetic products and bubble memories. The two sites are near each other and each of the parties essentially treats them as one for purposes of asserting or denying errors in the administrative proceedings. Therefore, we too will discuss them together.

EPA included the Intel sites on the NPL based on the Agency's conclusion that there was an observed release to groundwater of 1,1–dichloroethene ("DCE"). Relying on this conclusion and the fact that approximately 300,000 people within three miles of the sites depend upon groundwater from the relevant "aquifer of concern" as a source of drinking water, EPA derived an HRS score of 31.94 for each site. Intel first attacks the listing of its sites on the theory that there was no observed release to the relevant aquifer of concern. In Intel's view, the only observed release is to the shallow or upper aquifer zone, while the groundwater use is from a deeper or lower aquifer zone. As we noted in *Eagle–Picher III*, "[t]he EPA has incorporated an 'aquifer of concern' principle into its regulations, requiring a scorer to consider the same aquifer when scoring for the observed release or route characteristics as when calculating target characteristics such as population served." 822 F.2d at 138 (citation omitted).

Intel, like the petitioner in *Eagle–Picher III*, contends that EPA has violated this aquifer of concern principle by calculating the score using a factor based on an observed release to the upper acquifer and a target factor based on the population drawing from a separate lower aquifer, resulting in a much higher score than would result from either taken alone. Computations treating the aquifers separately would not have caused inclusion of the sites on the NPL since there was no observed release to the lower, and no population drawing on the upper.

---

3. *See* further discussion of this topic in relation to the Intel sites, *infra*.

4. While Intel had challenged the inclusion of a third site (the Mountain View Plant) at the administrative level during the comment period before the publication of the final rule, it has not petitioned from the inclusion of that site on the final update list.

According to the HRS scoring process, direct evidence of a release results in a maximum (45) score on the relevant worksheet. 40 C.F.R. pt. 300, app. A § 3.1 (1987). This is based on the obvious conclusion that an observed release "indicates that the likelihood of a release is 100%." 47 Fed.Reg. 31188 (1982). Without an observed release, the scoring process requires the use of "route characteristics" for determining the likelihood of a release. *See* 40 C.F.R. pt. 300, app. A §§ 3.1, 3.2 (1987). This likelihood, obviously being less than 100%, would result in somewhat less than a maximum score. In this case, that score is sufficiently lower to qualify Intel's sites for exclusion from the NPL update.

This argument by Intel is identical to the one made in *Eagle–Picher III, supra.* In that case, the petitioner asserted that EPA had "measured the level of contamination in [an aquifer] from which drinking water is no longer drawn, but used [another aquifer], which supplies the area with drinking water, for calculating the target population." 822 F.2d at 138. However, what EPA had in fact done in that instance was conclude that because of bore holes and other hydrologic connections, pollution from the first constituted a release to the second. In other words, EPA had concluded that there were not two aquifers, but two parts of the same aquifer, so that contamination of the one was an observed release to the other. We held this conclusion by EPA to be entirely proper, stating that "we think it clear that the aquifer-of-concern principle does not preclude the combination of hydrologically connected aquifers for scoring purposes." *Id.* (citation omitted).

■ The record underlying the present petition directly parallels the recited facts of *Eagle–Picher III.* EPA noted contamination to the "upper aquifer" revealing an observed release. Even though the target population uses the "lower aquifer," EPA noted in its initial proposal that the upper and lower zones were in fact connected and

thus together constituted one aquifer of concern. HRS Score Sheet and Documentation Record at 2 (Aug. 23, 1984), NPL–U2–2–202, *reprinted in* J.A. 1006; HRS Score Sheet and Documentation Record at 2 (Aug. 24, 1984), NPL–U2–2–203, *reprinted in* J.A. 1029. EPA originally based this conclusion on the presence of wells believed to be capable of conducting contaminants from the upper to lower aquifer zones. Rationale for Establishing the Hydraulic Connection Between the Aquifer Zones in the Santa Clara Valley (Aug. 1984), NPL–U2–15–4–3, NPL–U2–15–5–3, *reprinted in* J.A. 1227–31 (hereinafter EPA Rationale for Zones). During the comment period Intel and a number of other commenters criticized this conclusion. Based on those comments, EPA reexamined the question with the benefit of the comments and the work of a consultant in the field. Taking into account the prior information concerning the wells, the arguments offered by the commenters, and the nature of the contaminants present,[5] EPA renewed its conclusion that the two aquifers were, in fact, not separate but hydrologically connected. Thus, the Agency renewed its conclusion that release, having occurred, was 100% likely, and reaffirmed the prior scoring. As we did in *Eagle–Picher III, supra*, we note that where a contaminated aquifer spreads water to an aquifer supplying a target population, contamination to the first is hazard to the second and the "Agency reasonably treat[s] them as a unit for purposes of the Hazard Ranking System." 822 F.2d at 139.

■ Further, Intel argues that the Agency deprived it of a proper opportunity for comment in violation of the Administrative Procedure Act. 5 U.S.C. § 553 (1982). Intel argues that the Agency, by considering the consultant's information between the publication of the proposed rule and the adoption of the final rule, changed its theory and proceeded to operate on the "single aquifer" basis without giving Intel and other interested parties a chance to comment.

5. The relevant contaminant, Freon, is an industrially produced chlorofluorocarbon which does not occur in nature. It therefore must be the result of surface activity to be found in the lower aquifer.

This, Intel argues, is a prejudicial violation of proper administrative procedure since

> it is especially important for the agency to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.... An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.

*Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 530–31 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). However, the facts in this case do not support the application of that principle of administrative law. EPA set out its position early on that the aquifers were connected. EPA Rationale for Zones, *supra,* at 1227–31. Intel not only had the opportunity to comment on the aquifer interconnection issue, in fact it and other commenters specifically addressed that very issue. EPA specifically responded to the comments. Concededly, the Agency in its responses placed additional reliance on a 1984 study conducted by the state of California and brought to the attention of EPA by its consultant during the comment period, but EPA's conclusion that the aquifers are connected has never changed. As we noted in Section I, *supra,* an Agency may promulgate a final rule that differs from its proposed rule without allowing further comment if the relevant changes are a "logical outgrowth" of the proposed rule and the notice and comments upon it. *NRDC v. Thomas,* 838 F.2d 1224, 1242 (D.C.Cir.1988); *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983). The statutory requirement of notice and the opportunity for comment on a proposed rule "does not automatically generate a new opportunity for comment" every time the Agency reacts to the comments. *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 (D.C. Cir.1973).

As we have long recognized, "[a] contrary rule would lead to the absurdity that ... the agency can learn from the comment on its proposals only at the peril of starting a new procedural round of commentary."

*Id.* at 632 n. 51. If it were not possible for an agency to reexamine and even modify the proposed rule, there would be little point in the comment procedures. "The whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved —from the rules originally proposed by the agency." *Trans–Pacific Freight Conference of Japan/Korea v. Federal Maritime Comm'n,* 650 F.2d 1235, 1249 (D.C.Cir. 1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981).

■ There are, of course, cases in which changes exceed the logical outgrowth and prejudicial error would occur if no second round were afforded. *Cf. Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 533 (D.C.Cir.1982) ("An agency adopting final rules that differ from its proposed rules is required to renotice when the changes are *so major* that the original notice did not adequately frame the subjects for discussion." (emphasis added)). This is not such a case. EPA's original notice of proposed rulemaking gave the petitioner and others an adequate foundation for comment. Petitioner exercised its right on the very point in question. EPA's solicitation of additional data did not defeat petitioner's right to comment. Rather, EPA has allowed petitioner full exercise of that right. Intel's problem is not that it could not make comments but simply that EPA did not agree with its comments.

■ Intel also argues that EPA should not have used DCE for the determination of the toxicity/persistence element of the scoring computation because to do so was a violation of EPA's own rules. This argument is derived from the EPA regulation which requires that a contaminant be present in a "reportable quantity" in order to be used in computing the HRS score. 40 C.F.R. pt. 300, app. A § 3.4 (1987). Intel contends that the detected DCE did not amount to this quantity. However, that regulation applies only in the rare instance "[w]here the total inventory of substances in a facility is known," and is, therefore, inapplicable here. *Id.* EPA did not pos-

sess, nor did Intel supply, a total inventory of substances at the Intel facilities. All that was before the Agency, and all that is now before the Court on the subject of quantity is Intel's calculation back from the amount of contaminant detected in the water to the quantity of hazardous substance which that detected quantity of contaminant could index. This is a far cry from the total inventory contemplated by § 3.4. Indeed, Intel specifically admitted in its comments that it was unable to determine when, how, and in what quantity the chemicals entered the groundwater. Comments of Intel Corporation on the Proposed Listing of Intel Magnetics, Intel Santa Clara III and Intel Mountain View on the National Priorities List (NPL) at 9 (Dec. 13, 1984), NPL–U2–3–542, *reprinted in* J.A. 1058. It requires but a moment's thought to reveal that this sort of back calculation has no statistical reliability. The amount of contaminant indexed by detection in a single monitoring well may reflect a concentration at the very edge of a plume, or from its center, anywhere in between, or even at a single pocket of contamination. Intel's argument on this point is without merit.

In sum, Intel, like Stoughton, has failed to demonstrate any error in EPA's placing of its landfill sites on the NPL.

### C. *Republic Steel Quarry*

■ The city of Elyria owns an old quarry used by Republic Steel Corporation from 1950 until 1972 for the discharge of approximately 200,000 gallons of waste pickle liquors per year. Republic had discarded the pickle liquor after its use as an acid to dissolve oxides formed on steel during the hot-rolling process. EPA, relying on studies showing: (1) the presence of cadmium, chromium, vanadium, zinc, and arsenic in the groundwater; and (2) an estimated 800 people living within three miles of the site who rely on local groundwater as a source of drinking water, scored a maximum for observed release and entered a total HRS score of 29.85, qualifying the site for inclusion on the NPL update. Elyria, like Intel, attacks both the scoring and the testing methodology underlying EPA's decision. Where Intel had attacked the scoring on

the basis of EPA's treatment of two aquifers as one in the route characteristic component of the computation, Elyria contends that EPA has treated two populations as one in the target component.

In the calculation of an HRS score, as applied to this site, EPA assigns values to five rating factors: observed release, route characteristics, containment, waste characteristics, and target population. The assignment of values for target population consists of a score for "groundwater use" added to a score for "distance to nearest well/population served." 40 C.F.R. pt. 300, app. A § 3.5 (1987). The raw groundwater use value ranges from zero to three depending upon the uses to which the aquifer of concern is put. *Id.* At the Republic Quarry, EPA assigned a value of three, which is appropriate under section 3.4 where the aquifer of concern is used for drinking water and no alternative water supply is available. Under the Agency's procedures, that value was multiplied by three to produce the final score for the groundwater-use element of the target value of the HRS scoring. That figure is then added to the figure for the "distance to nearest well/population served" score, in this case 16. That second component is achieved by the use of a matrix involving the size and nearness of the population to the site. 40 C.F.R., pt. 300, app. A § 3.5 (1987). EPA, in this case, based its computation on an estimate of population served of approximately 800 and a nearness factor based on residential wells within one mile of the site.

Petitioner argues that there are, in fact, two populations involved. The first is a small population of fewer than 100 people who had an alternate water supply available. This would yield a groundwater use score of six rather than nine, as found by EPA, but a population served value of zero which would produce a well/population component of ten. Thus, the total target score would be 16, nine less than the value arrived at by EPA's calculations. Petitioner identifies a second, larger but more distant population that had no alternative water supply and would receive a maximum

groundwater use value of nine. This calculation would yield a population size score of two, which produces a matrix-determined distance/population component of 12. Thus the total target score would be 21. Either way, Elyria argues, the score is lower than that produced by EPA's calculation which lumped the two "separate populations" into one.

Appealing as this reasoning may at first appear, it does not invalidate EPA's scoring of the target factor. As discussed earlier, EPA uses two subfactors in estimating the population at risk from contaminated groundwater: "groundwater use" and "distance to nearest well/population served." 40 C.F.R. pt. 300, app. A § 3.5 (1987). The first subfactor "indicates the nature of the use made of ground water drawn from the aquifer of concern within 3 miles of the hazardous substance." *Id.* In the instant case, there were people within that three mile radius dependent on the aquifer of concern for drinking water and who had no alternative supply. As noted above, this yields a nine for the first factor. The second factor involved a well which was (based on data from the relevant county health department) between 2,000 feet and one mile from the site and served a total population of approximately 800, yielding a score of three, matrix-adjusted to 16, for a total of 25. Computed with the other HRS components, this totalled 29.85 and resulted in the site's inclusion on the NPL.

Either of petitioner's computations combined with EPA's computations for the first four characteristics yields a total HRS score lower than the 28.5 required for inclusion on the NPL. Thus, if we accepted Elyria's computations we would be required to allow the petition and set aside the Agency's decision. However, we are not required to accept Elyria's computations. Nothing in EPA regulations or in any other body of law requires EPA to make a subdivision of the population under examination. It appears to us that this is as it must be. While Elyria asserts that it is possible to make the requested breakdown in the particular population under examination here, EPA obviously must operate under regulations generally applica-

ble. No doubt there are many target populations in which some part thereof has alternative drinking water sources and some part does not. EPA has enough to do in simply determining the population at risk, its nearness to the source of pollution, and the fact that some part of it does not have alternative drinking water sources, without making a house-by-house count. In the present case, for example, the conceded total population within a three mile radius is approximately 60,000. EPA was able to sort out the relevant components to the degree indicated in the described target component calculation. We find no reason to require anything further. In *Eagle–Picher III, supra,* we rejected another challenge to a target factor computation, concluding that that challenge "in essence contests the Hazard Ranking System's preference for using formulas even where actual figures are available, a preference which we have already upheld." 822 F.2d at 146 (citing *Eagle–Picher I,* 759 F.2d at 921–22). In this case, as in that, the use of the formula is not arbitrary or capricious, and the record supports the Agency's conclusion.

As to the methodology employed in reaching the maximum score on observed release, Elyria makes colorable arguments that EPA's computation is inadequate. These arguments center on the presence of evidence that the Agency's contractor did not properly filter samples from the quarry before analysis. Republic Steel Quarry Law Water Metals Groundwater Monitoring Wells Sampling Results at 1–2 (Dec. 13, 1983), NPL–U2–15–2–2, *reprinted in* J.A. 2059–60. Samples taken by petitioner's contractor in the presence of Agency representatives followed proper filtration methods and found concentrations of contaminants lower than upgradient wells thus, at least arguably, negating the observed release. Public Comments Regarding NPL Update # 2; Lawrence A. Szuhay, Manager, Waste Management Environmental Control at 3 (Dec. 14, 1984), NPL–U2–3–547, *reprinted in* J.A. 2027. However, the evidence is also susceptible to the interpretation that the samples were properly fil-

tered. That interpretation is a reasonable one, and we will not substitute our judgment for that of the Agency. *Cf. Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The fact that a later test yielded different results does not require that EPA remove its score of an observed release. "[N]egative results during one or more sampling intervals cannot refute a finding, when based on valid sampling and analyses, that an observed release has occurred." 49 Fed.Reg. 37070, 37078 (1984). Since EPA's conclusion that its sampling and analysis was valid is not an arbitrary or capricious one, we will not disturb this component of the score.[6]

In sum, petitioner Elyria has not demonstrated that EPA's inclusion of the Republic Steel Quarry on the second NPL update is arbitrary, capricious, or otherwise contrary to law.

### III. CONCLUSION

In the end, all these challenges to the update of the NPL are finally governed by the language we quoted above from *Eagle–Picher I:* "EPA's decision to reconcile the need for certainty before action with the need for inexpensive, expeditious procedures to identify potentially hazardous sites ... is reasonable and fully in accord with congressional intent." 759 F.2d at 921. It is not necessary that EPA's decisions as to what sites are included on the NPL be perfect, nor even that they be the best. It may be true that in some or all three of these cases, EPA's actions are imperfect. Certainly they may not always be based on the best possible methodology. Nonetheless, considering the importance of EPA's goals, including protecting human life from potentially disastrous contamination and the congressionally mandated need for speedy action, we deny the petitions and affirm the decision in each case.

---

**6.** A 1987 EPA work plan for the site prepared by a new contractor, opining that the prior samples were not properly filtered, does not affect this opinion. That document is not part of the administrative record in this case and will not be considered in this review. *See Walter O. Boswell Memorial Hospital v. Heckler,* 749 F.2d 788, 792 (D.C.Cir.1982).